Argued and submitted January 16, certified questions and additional question answered August 8, 2002

# Frank Leon DeMENDOZA
## and Javier Mendoza,
### *Plaintiffs,*

*v.*

## Bruce HUFFMAN,
### William Huffman, and Evelene Huffman,
### *Defendants,*

### *and*

## STATE OF OREGON,
### *Intervenor-Defendant.*

(CV 95-3071-PA; SC S48430)

51 P3d 1232

Kathryn H. Clarke, Portland, argued the cause and filed the brief for plaintiffs. With her on the brief was David V. Gilstrap, of Davis, Gilstrap, Hearn, Shaw, & Saladoff, Ashland.

No appearance for defendants.

Mary H. Williams, Assistant Solicitor General, Salem, argued the cause and filed the brief for intervenor-defendant. With her on the brief were Hardy Myers, Attorney General, Michael D. Reynolds, Solicitor General, and Julie A. Smith, Assistant Attorney General.

Charles J. Merten, Beaverton, filed the brief for *amicus curiae* Oregon Trial Lawyers Association.

Elizabeth A. Earls, of Associated Oregon Industries, Salem, filed the brief for *amicus curiae* Associated Oregon Industries.

BALMER, J.

**BALMER, J.**

This case is before the court on certified questions of Oregon law from the United States District Court for the District of Oregon under ORS 28.200 *et seq.* and ORAP 12.20. *See generally Western Helicopter Services v. Rogerson Aircraft*, 311 Or 361, 811 P2d 627 (1991) (discussing factors court considers in exercising discretion to accept certified questions). The certified questions ask whether ORS 18.540,[1] which allocates 60 percent of each punitive damages award in Oregon to the state's Criminal Injuries Compensation Account, violates specified provisions of the state constitution. For the reasons that follow, we conclude that it does not.

We take the facts from the District Court certification order. A jury assessed punitive damages against defendants in the amount of $550,000 for the wrongful use of civil proceedings and fraudulent transfer of real property. The Ninth Circuit affirmed the jury's decision. *DeMendoza v. Huffman*, 2001 WL 30084 (9th Cir Jan 8, 2001) (unpublished opinion). Defendants have abandoned further appeal, and the only issue remaining is the proper distribution of the punitive damages award.

On April 9, 2001, the District Court granted the state's motion to intervene as a judgment creditor to assert the state's claim under ORS 18.540 to a portion of the punitive damages award. Plaintiffs then challenged the constitutionality of ORS 18.540 on multiple grounds, arguing that they were entitled to the entire award. Because Oregon appellate courts have not previously decided whether, by allocating to the state a 60 percent share in punitive damage awards, ORS 18.540 violates provisions of the state constitution, the District Court certified to this court the following five questions:

---

[1] The text of ORS 18.540 (1995) is set out *post*, 334 Or at 429-30. The parties agree that the 1995 version of the statute, which was in force when plaintiffs filed their complaint, is the version at issue here. The statute was amended in 1997, *see* Or Laws 1997, ch 73, § 1, but those amendments are not relevant to our discussion of the certified questions in this case. All future references to ORS 18.540 in this opinion are to the 1995 version of that statute.

"1. Does ORS 18.540 violate Article I, section 18, of the Oregon Constitution?

"2. Does ORS 18.540 violate Article IV, section 18, and Article IX, sections 1 and 3, of the Oregon Constitution?

"3. Does ORS 18.540 violate the right to jury trial protected by Article I, section 17, and Article VII (Amended), section 3, of the Oregon Constitution?

"4. Does ORS 18.540 violate the 'remedy' or 'justice' clauses of Article I, section 10, of the Oregon Constitution?

"5. Does ORS 18.540 violate the separation of powers doctrine protected by Article III, section 1, and Article VII (Amended), section 1, of the Oregon Constitution?"

We accepted certification of those questions and, because the case involved state law claims that were tried in federal court under that court's diversity jurisdiction, we added an initial question of law:

"Did the Oregon legislature contemplate the application of ORS 18.540 in federal cases arising under state law?"

*See Western Helicopter Services*, 311 Or at 370-71 (court has discretion to reframe questions presented). We begin with that threshold question.

I.

■ Since 1987, Oregon statutes have directed that a portion of any punitive damages award be paid into a state fund for victims of crime. *See* Or Laws 1987, ch 774, § 3 (creating state fund). Codified at ORS 18.540, the legislature has amended that so-called "split-recovery" statute several times, most recently in 1997. *See* Or Laws 1997, ch 73, § 1. Plaintiffs filed their complaint on September 25, 1995. At that time, ORS 18.540 provided:

"(1) Upon the entry of a verdict including an award of punitive damages, the Department of Justice shall become a judgment creditor as to the punitive damages portion of the award to which the Criminal Injuries Compensation Account is entitled pursuant to paragraph (b) of this subsection, and the punitive damage portion of an award shall be allocated as follows:

"(a) Forty percent shall be paid to the prevailing party. The attorney for the prevailing party shall be paid out of the amount allocated under this paragraph, in the amount agreed upon between the attorney and the prevailing party. However, in no event may more than 20 percent of the amount awarded as punitive damages be paid to the attorney for the prevailing party.

"(b) Sixty percent shall be paid to the Criminal Injuries Compensation Account to be used for the purposes set forth in ORS chapter 147. However, if the prevailing party is a public entity, the amount otherwise payable to the Criminal Injuries Compensation Account shall be paid to the general fund of the public entity.

"(2) The party preparing the proposed judgment shall assure that the judgment identifies the judgment creditors specified in subsection (1) of this section.

"(3) Upon the entry of a verdict including an award of punitive damages, the prevailing party shall provide notice of the judgment to the Department of Justice. The notice shall be in writing and shall be delivered to the Department of Justice within five days after the entry of the verdict.

"(4) Whenever a judgment includes both compensatory and punitive damages, any payment on the judgment by or on behalf of any defendant, whether voluntary or by execution or otherwise, shall be applied first to compensatory damages, costs and court-awarded attorney fees awarded against that defendant and then to punitive damages awarded against that defendant unless all affected parties, including the Department of Justice, expressly agree otherwise, or unless that application is contrary to the express terms of the judgment.

"(5) Whenever any judgment creditor of a judgment which includes punitive damages governed by this section receives any payment on the judgment by or on behalf of any defendant, the judgment creditor receiving the payment shall notify the attorney for the other judgment creditors and all sums collected shall be applied as required by subsections (1) and (4) of this section, unless all affected parties, including the Department of Justice, expressly agree otherwise, or unless that application is contrary to the express terms of the judgment."

As noted, we first must determine whether the Oregon legislature contemplated that ORS 18.540 would apply in federal cases arising under state law. In that regard, plaintiffs emphasize that the statute specifies, in part, a *procedure* by which the state is "identified" as a judgment creditor. *See* ORS 18.540(2). Federal courts follow their own procedures, which do not similarly provide for the identification of judgment creditors. *See In re Stein*, 236 BR 34, 37 (D Or 1999) (so stating). Therefore, plaintiffs argue, the legislature did not intend ORS 18.540 to apply in federal courts, because the application of that statute would impose a state rule of procedure upon federal courts in violation of the Supremacy Clause of the federal constitution. *See* US Const, Art VI, cl 2; *Finley v. Empiregas Inc. of Potosi*, 28 F3d 782, 785 n 7 (8th Cir 1994) (refusing to enforce, as violation of Supremacy Clause, state procedure requiring court clerks to notify state of final judgment awarding punitive damages, when no "parallel provision" existed in federal rules of procedure).

As further support for their position, plaintiffs note that the text of ORS 18.540 indicates that the split-recovery provision would not apply to all punitive damage awards; rather, it would apply only to "punitive damages *governed by this section*." ORS 18.540(5) (emphasis added). According to plaintiffs, that statement is evidence that the legislature contemplated that some punitive damages awards—including, plaintiffs argue, those determined in federal courts—are to be excluded from the requirements of ORS 18.540.

The state, in response, concedes that subsection (2) of ORS 18.540 specifies a procedure and that federal courts generally have been unwilling to adopt it. *See, e.g., Stein*, 236 BR at 37 (noting that ORS 18.540(2) does not require federal courts to identify state as judgment creditor, because that provision "is procedural and does not apply to federal court judgments"). However, the state contends that the legislature nonetheless intended that *other* provisions of ORS 18.540 would apply in federal cases arising under state law, including the provisions that establish the state's *substantive* right to 60 percent of all punitive damages awards.

We agree with the state. Contrary to plaintiffs' assertions, the legislature's intent with respect to ORS

18.540 as substantive law cannot be determined from the possibility that procedural aspects of the statute may be inapplicable in federal court. ORS 18.540 unambiguously creates in the state a substantive right as a judgment creditor to 60 percent of any punitive damages award. That right exists whether or not a federal court lists the state as a judgment creditor under ORS 18.540(2), and, indeed, the state may enforce its right by other means.[2] For example, in this case, as in others, the Oregon federal district court has recognized the state's ability to intervene under FRCP 24[3] to enforce its substantive rights under ORS 18.540. *See Stein*, 236 BR at 37 (noting that state may become judgment creditor under ORS 18.540, even if not identified as such in federal judgment).

■ Legislative intent is derived, instead, from the statute's text and context, *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), and the text and context of ORS 18.540 provide no exception to the substantive aspects of the statute in federal cases arising under state law. The absence of an exception is significant, because we may not, as a general rule, "insert what has been omitted" in a statute. ORS 174.010. Neither can we agree with plaintiffs that a legislative intent to limit the application of ORS 18.540 in federal cases can be inferred from the qualifying statement contained in subsection (5), which, as noted, restricts application to "punitive damages *governed by this section*." ORS 18.540(5) (emphasis added). Given a natural reading, that phrase refers to punitive damages awards as to which the state becomes a judgment creditor under ORS

---

[2] *Finley v. Empiregas Inc. of Potosi*, 28 F3d 782 (8th Cir 1994), cited by plaintiffs, is not to the contrary. In that case, the court concluded that the text of Missouri's split-recovery statute explicitly prohibited the state from intervening to assert an interest in a punitive damages award. *Id.* at 785. *See* Mo Ann Stat § 537.675(3) (Vernon 2000) ("The state of Missouri shall have no interest in or right to intervene at any stage of any judicial proceeding under this section."). ORS 18.540 contains no such prohibition.

[3] FRCP 24(a) provides:

"Upon timely application anyone shall be permitted to intervene in an action * * * when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."

18.540, in contrast to those punitive damages awards that the statute itself excludes from its coverage, such as those awarded to public entities. *See* ORS 18.540(1)(b). In light of the foregoing, we conclude that the legislature contemplated that ORS 18.540 would apply in federal cases arising under Oregon state law.

## II.

We turn to the issue whether ORS 18.540 violates the five provisions of the Oregon Constitution that are presented in the certified questions. For organizational purposes, we begin with the fourth certified question, which deals with the remedy clause of Article I, section 10, as our analysis of that provision provides background and support for our conclusions with respect to the other certified questions.

### A. *Remedy Clause*

Article I, section 10, provides that

"[n]o court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and *every man shall have a remedy by due course of law for injury done him in his person, property, or reputation.*"

(Emphasis added.) In *Smothers v. Gresham Transfer, Inc.*, 332 Or 83, 124, 23 P3d 333 (2001), this court examined in detail the origin and meaning of the remedy clause, and held that, because Article I, section 10, guarantees a remedy for any injury to absolute common-law rights respecting person, property, or reputation, the legislature does not have the authority to deny a remedy for such injuries. The conclusions about the remedy clause outlined in *Smothers* define the inquiry necessary to determine whether legislative action violates that constitutional guarantee. *See Jensen v. Whitlow*, 334 Or 412, 417-18, 51 P3d 599 (2002) (so stating). In accordance with the analytical approach of *Smothers*, our first step, ordinarily, is to determine whether the injury that plaintiffs have alleged is one for which the remedy clause guarantees a remedy. *Smothers*, 332 Or at 124. If so, then the next question is whether the legislation at issue—in this

case, ORS 18.540—abolished that remedy without providing a constitutionally adequate substitute. *Id.*

In this case, the parties appear to agree that the injury plaintiffs allege—their underlying claims for wrongful use of civil proceedings and fraudulent transfer of real property—are ones for which Article I, section 10, guarantees a remedy. The parties' dispute concerns whether the jury's punitive damages award is part of that constitutionally protected remedy. Plaintiffs argue that the punitive damages award itself is a remedy to which they are entitled under Article I, section 10, and that, therefore, the legislature may not interfere with plaintiffs' receipt of that award without providing a constitutionally adequate substitute remedy.[4] As we explain below, a punitive damages award is not a "remedy" that Article I, section 10, guarantees to a particular party for injury to person, property, or reputation.

This court previously examined whether Article I, section 10, protects the availability of punitive damages awards as a "remedy" in *Wheeler v. Green*, 286 Or 99, 118-19, 593 P2d 777 (1979). There, the court's concern was whether the availability of punitive damages awards in actions for defamation amounted to a restraint of free speech in violation of Article I, section 8, of the Oregon Constitution.[5] Because, among other reasons, "the threat of large damage recoveries can easily inhibit the exercise of freedom of constitutionally protected expression, as well as its abuse," the court was "convinced * * * that a proper application of Article I[, section] 8, prohibit[ed] the award of punitive damages in

---

[4] Plaintiffs present additional arguments that the availability of punitive damages is required under Article I, section 10, to ensure that justice is administered "without purchase." That phrase "means simply that justice shall not be bought with bribes, nor shall the attendant or incidental expenses of litigation, in the nature of costs and disbursements, be so exorbitant and onerous as to virtually close the doors of courts of justice to those who may have occasion to enter there." *Bailey v. Frush*, 5 Or 136, 138 (1873). We reject without further discussion the notion that, by allocating punitive damages to the Criminal Injuries Compensation Account, ORS 18.540 violates that aspect of Article I, section 10.

[5] Article I, section 8, of the Oregon Constitution, provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

defamation cases, *unless* some other constitutional provision require[d] that they be allowed." *Id.* at 119 (emphasis added).

Turning to examine Article I, section 10, the court concluded that that constitutional provision did not require the availability of punitive damages because " '* * * such damages are awarded by way of punishment to the offender and as a warning to others, or according to some authorities, by way of example.' " *Wheeler*, 286 Or at 118 (quoting *Martin v. Cambas*, 134 Or 257, 261, 293 P 601 (1930)). In other words, punitive damages were "[not] necessary to compensate the plaintiff for injury to reputation." *Wheeler*, 286 Or at 118. The court therefore concluded that it is the right to recover compensation for injuries suffered, not the punishment or deterrence that punitive damages might provide, that is the "remedy" protected by Article I, section 10. *Id.* at 119 (citing *Davidson v. Rogers*, 281 Or 219, 222, 574 P2d 624 (1978) (Linde, J., concurring) (statute that bars general damages for defamation, absent timely retraction request, does not violate Article I, section 10)). *See also Hall v. The May Dept. Stores*, 292 Or 131, 145, 637 P2d 126 (1981) (remedy under Article I, section 10, "does not extend beyond compensation for the injury to punishment or deterrence").

Plaintiffs argue that the conclusions reached in *Wheeler* were the result of a unique situation that required the balancing of two competing constitutional interests. They assert that "Article I, [section] 10[,] did not require punitive damages in defamation cases, *because* Article I[, section] 8[,] protected free expression." (Emphasis in plaintiffs' brief.) However, that interpretation of *Wheeler* is the opposite of what this court stated in that case. As explained above, the court in *Wheeler* held that Article I, section 8, could be interpreted to bar plaintiffs' recovery of punitive damages *because* Article I, section 10, does not protect those damages as a remedy for plaintiffs who suffer an injury to reputation. *Wheeler*, 286 Or at 118-19. In other words, *Wheeler* suggests that Article I, section 10, does not protect punitive damages awards generally, and, with respect to this case, *Wheeler* thus supports the conclusion that the state can, as it does under ORS 18.540, appropriate portions of punitive damages awards in *any* case without depriving plaintiffs of a constitutionally protected remedy.

Nevertheless, although we view the conclusions in *Wheeler* to be relevant here with respect to Article I, section 10, in that case the court did not engage in as detailed an analysis of the origins and meaning of the constitutional provision as this court more recently has concluded is appropriate. *See Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992) (setting out methodology for analyzing constitutional provision). For that reason, we choose to follow the inquiry set out in this court's more recent case law. However, in doing so, we do not reject the conclusion that this court reached in *Wheeler*. Indeed, this court's holding in *Wheeler* is consistent with the conclusion we reach here regarding Article I, section 10.

■ Under the analytical framework set out in *Priest* and followed in *Smothers*, we address an original constitutional provision on three levels: "Its specific wording, the case law surrounding it, and the historical circumstances that led to its creation." *Priest*, 314 Or at 415-16. According to the state, such an analysis reveals that the framers of Article I, section 10, viewed the purpose of punitive damages in Oregon as a means of punishing a defendant for particularly egregious conduct and deterring such conduct in the future. In light of that dual purpose, both aspects of which focus solely on vindicating society's interests, the state contends that the framers did not intend punitive damages to be a "remedy" protected by Article I, section 10, because such damages were not necessary to compensate a particular plaintiff for injury caused by the defendant's conduct. The state's position is consistent with the conclusions that this court reached in *Wheeler*, and, for the reasons that follow, it is correct.

1. *Text*

We begin with an analysis of the text of Article I, section 10. *Priest*, 314 Or at 415-16. As we noted above, the remedy clause of that provision guarantees that persons whose protected rights have been injured will have a means to seek redress for such injuries. *Smothers*, 332 Or at 119-20, 124. Significantly, the text of Article I, section 10, protects the availability of a remedy "to every man" only for an "injury done *him* in *his* person, property, or reputation."[6] (Emphasis

---

[6] As this court stated in *Smothers*, 332 Or at 90, we interpret "every man" in Article I, section 10, to mean every person.

added.) Those words indicate that Article I, section 10, protects punitive damages as a "remedy" only if those damages are a means of restoring the rights of an injured party. To determine whether that is the case, we turn to an examination of the historical circumstances surrounding the adoption of Article I, section 10. *Priest*, 314 Or at 415-16.

## 2. *Historical Circumstances*

During the two decades before the drafting of Article I, section 10, in 1857, two treatises appear to have had particularly strong influence on the thinking surrounding the subject of punitive damages: Simon Greenleaf's *Treatise on the Law of Evidence*, published in 1842, and Theodore Sedgwick's *On the Measure of Damages*, published five years later, in 1847. References to those two legal works were pervasive in American courts in the 1850s. Based upon those references, we assume that the framers of the Oregon Constitution were familiar with at least some of the many cases dealing with punitive damages that were decided under principles discussed in those treatises, even if they were not directly familiar with the treatises themselves.[7] On that assumption, we turn to a review of the two texts.

When Greenleaf published his treatise on evidence in 1842, American courts had been awarding punitive damages to plaintiffs for about 50 years, following a practice that had its modern origins in late eighteenth-century England.[8] In England, a plaintiff typically could recover compensatory damages only for tangible injuries to which an exact monetary value could be attached. Linda L. Schleuter & Kenneth R. Redden, 1 *Punitive Damages* § 1.3(C), 7 (4th ed 2000). As a consequence, the doctrine of punitive damages emerged from the English courts' desire, in part, to compensate plaintiffs

---

[7] We note that citations to both Greenleaf's and Sedgwick's treatises appear in the earliest volumes of the Oregon reports, including decisions that predate the drafting of the Oregon Constitution in 1857. *See, e.g., Bequette v. The Peoples' Trans. Co.*, 2 Or 200, 201 (1867) (citing Sedgwick); *Pratt v. King*, 1 Or 49, 50 (Or Terr 1853) (citing Greenleaf).

[8] For more extensive discussions of the origins of the modern doctrine of punitive damages in England and its subsequent development in America, *see generally* Linda L. Schleuter & Kenneth R. Redden, 1 *Punitive Damages* 1-16 (4th ed 2000); Donald Paul Hodel, *The Doctrine of Exemplary Damages in Oregon*, 44 Or L Rev 175, 176-78 (1965).

for intangible injuries, such as mental anguish and insult caused by especially egregious conduct, for which there was no available remedy. *Id.* § 1.3(D) at 8.[9] Unlike English courts, however, by the time Greenleaf wrote his treatise, courts in America steadily had expanded the notion of compensatory damages to cover intangible injuries to such an extent that the idea of punitive damages serving as additional compensation had begun to fade. *Id.* § 1.4(A) at 15. American courts instead justified punitive damages solely as a means by which juries could punish and deter defendants for egregious conduct. *Id.* § 1.4(A) at 16.

Greenleaf objected in his treatise that punitive damages, stripped of any compensatory justification, were an improper intrusion of a public interest into private disputes. *See* Simon Greenleaf, 2 *A Treatise on the Law of Evidence* § 253, 244 (3d ed 1850), *reprinted in* Morton J. Horowitz, ed., *American Law: The Formative Years* (1972). *See also* Michael Rustad & Thomas Koenig, *The Historical Continuity of Punitive Damages Awards: Reforming the Tort Reformers*, 42 Amer U L Rev 1269, 1298-1300 (1993) (reviewing Greenleaf's criticisms). Greenleaf asserted that

> "[d]amages are given as a compensation, recompense, or satisfaction to the plaintiff, for an injury actually received by him from the defendant. They should be precisely commensurate with the injury; neither more, nor less; and this, whether it be to his person or estate."

Greenleaf, 2 *Law of Evidence* § 253 at 244 (footnotes omitted). One of Greenleaf's practical concerns was that, by permitting society to vindicate an interest in punishment and deterrence in a private action, punitive damages threatened to expose a defendant, who might still be subject to criminal prosecution or fines, to double punishment. *Id.* § 253 at 244 n 2, 250.

In 1847, Sedgwick published the first edition of his treatise on damages. Rather than join Greenleaf in criticizing the propriety of punitive damages, Sedgwick declared that,

---

[9] *See, e.g., Tullidge v. Wade*, 95 Eng Rep 909, 910 (KB 1769) (justifying punitive damages on ground that "the circumstances of time and place, when and where the insult is given requires different damages, as it is a greater insult to be beaten upon the Royal Exchange than in a private room").

> " 'wherever the elements of fraud, malice, gross negligence, or oppression mingle in the controversy, the law, instead of adhering to the system, or even the language of compensation, adopts a wholly different rule. It permits the Jury to give what it terms punitory, vindictive, or exemplary damages; in other words, blends together the interest of society and of the aggrieved individual, and gives damages *not only to recompense the sufferer, but to punish the offender.*' "

Greenleaf, 2 *Law of Evidence* § 253 at 244 n 2 (quoting Theodore Sedgwick, *Sedgwick on Damages* 39) (emphasis in Greenleaf). Sedgwick justified his views primarily on the ground of *stare decisis* (indeed, Sedgwick conceded that, "were it a new proposition, [punitive damages] would strike the Anglo-Saxon lawyer as an absurdity"[10]), and he cited the many American and English cases where courts had approved of punitive damages awards in the past. *See* Theodore Sedgwick, *Sedgwick on the Measure of Damages* 525-32 (4th ed 1868) (hereinafter *Sedgwick on Damages* (4th ed)).

In subsequent editions of his treatise, Greenleaf included a rejoinder to Sedgwick's statement of the law, pointing out that, in each of the cases that Sedgwick had cited as approving of punitive damages, the courts actually had used such terms as "exemplary" or "vindictive" damages to refer to damages for mental anguish, personal indignity, insult, or other injury. In other words, in Greenleaf's view, the courts improperly had described as "exemplary" or "vindictive" damages what should have been understood as compensatory damages for nontangible injuries. Greenleaf, *Law of Evidence* § 253 at 244 n 2, 249-50. *See also* Donald Paul Hodel, *The Doctrine of Exemplary Damages in Oregon*, 44 Or L Rev 175, 177 (1965) (reviewing Greenleaf's criticism). Greenleaf thus continued to insist that "true" punitive damages—*i.e.*, damages inflicted solely to punish and deter—had no doctrinal support. *See* Rustad, 42 Amer U L Rev at 1299.

---

[10] Theodore Sedgwick, *Sedgwick on the Measure of Damages* 532 n ‡, 535 (4th ed 1868). Sedgwick went so far as to concede in later editions of his treatise that Greenleaf and other opponents of the doctrine of punitive damages "have maintained, what is perfectly true, that it is an exceptional or anomalous doctrine, at variance with the general rule of compensation; hence that, logically, it is wrong." Theodore Sedgwick, 1 *Sedgwick on Damages* § 353, 515 (8th ed 1891).

Sedgwick subsequently modified his view of punitive damages to omit any reference to a compensatory justification, but he nonetheless continued to maintain that such damages were warranted to "impose a punishment on the defendant and [to] hold up an example to the community." *Sedgwick on Damages* (4th ed) at 522.

Courts in the 1850s frequently cited the conflict between Greenleaf and Sedgwick in decisions involving punitive damage awards.[11] Although many acknowledged Greenleaf's criticisms, only four states (Louisiana, Massachusetts, Nebraska, and Washington) ultimately rejected as improper the awarding of punitive damages to punish a defendant in any case. *See* Charles T. McCormick, *McCormick on Damages* § 78, 278-79 (1935) (reviewing extent of acceptance of punitive damages). Most state courts accepted Sedgwick's view that punitive damages, whether or not conceptually satisfying, had become part of the law, based on long-standing precedent.[12] However, what is significant here is not that Sedgwick's view ultimately prevailed in the majority of states but, rather, the way in which Greenleaf and Sedgwick had framed the debate—namely, whether punitive damages were an appropriate means of vindicating an interest of *society*. Neither writer asserted that punitive damages were necessary to vindicate an interest of an injured *plaintiff*.

In 1851, the United States Supreme Court acknowledged that, although "the propriety of [the] doctrine [of punitive damages had] been questioned by some writers,"

---

[11] *See, e.g., St. Peter's v. Harvey Beach,* 26 Conn 355, 1857 WL 960 (1857); *Fowler v. Sergeant,* 1 Grant 355, 1856 WL 6922 (Pa 1856); *Black v. The Carollton Railroad Co.,* 10 La Ann 33, 1855 WL 113 (1855); *Fry v. Bennett,* 1 Abb Pr 289, 1855 WL 6398 (NY Sup 1855); *McWilliams v. Bragg,* 3 Wis 424, 1854 WL 3450 (1854); *Taber v. Hutson,* 5 Ind 322, 1854 WL 3361 (1854); *True & ux. v. Plumley,* 36 Me 466, 1853 WL 2042 (1853).

[12] Not every state acceded quietly. *See, e.g., Fay v. Parker,* 53 NH 342, 350-62, 1872 WL 4394 (1872), comparing the doctrine of punitive damages to a physical deformity:

"It was once said, 'If thy right eye offend thee, pluck it out; * * * and if thy right hand offend thee, cut it off.' Wherefore, not reluctantly should we apply the knife to this deformity, concerning which every true member of the sound and healthy body of the law may well exclaim, — 'I have no need of thee.' "

(undoubtedly referring to Greenleaf, among others) the matter had been settled as follows:

> "It is a well-established principle of the common law, that in * * * all actions on the case for torts, a jury may inflict what are called exemplary, punitive, or vindictive damages upon a defendant, *having in view the enormity of his offense rather than the measure of compensation to the plaintiff.*"

*Day v. Woodworth*, 54 US (13 How) 363, 371, 14 L Ed 181 (1851) (emphasis added). *Day* reflects the outcome of the Greenleaf-Sedgwick debate and illustrates the predominant view of punitive damages in the years preceding the drafting of the Oregon Constitution in 1857: Punitive damages were imposed on defendants as punishment and deterrence, not as a means of compensating an injured party.

Because it generally was understood that punitive damages were not compensatory in nature, it is not surprising that a plaintiff's receipt of those damages was not considered to be an entitlement or a right. Greenleaf, of course, because he advocated the abolition of punitive damages, certainly did not think so:

> " '* * * The criminal, by suffering in his goods, may be discouraged or prevented from offending again[;] but a design to discourage or prevent him from offending again can be no ground for that person, whom he has injured by offending once, to claim property in the goods, which he is deprived of. The ends of punishment may be answered by taking the criminal's goods from him[;] but these ends do not require, that the property, which he loses, should be vested in the person, whom he has injured.' "

Greenleaf, 2 *Law of Evidence* § 253 at 244 n 2, 254 (quoting T. Rutherforth, 1 *Rutherforth's Institutes of Natural Law* 434 (1799)). Sedgwick, on the other hand, believed that awarding plaintiffs punitive damages was a benign and even helpful practice:

> "[T]here is little practical harm in the injured party getting more than actual compensation, if it be proper that the offender should pay it. There is a large class of offences which society is slow in punishing. The community (or those who represent it in the prosecution of such offenses),

often fails to pursue the offender, and he would too often escape unless brought to justice by the determined effort which springs from the personal sense of wrong. *A change in the rule would therefore be, to a certain extent, an irreparable loss to society*."

*Sedgwick on Damages* (4th ed) at 532 n ‡, 535 (emphasis added). Sedgwick never suggested, however, that a plaintiff was entitled to receive punitive damages as a matter of right.

To the contrary, several common-law principles, endorsed by Sedgwick, among others, reinforced the idea that punitive damages were not a right or entitlement. First, it was recognized as a general rule that a jury had the discretion to refuse to award punitive damages, even if the plaintiff had proved all facts in support of such an award. *See, e.g.*, Theodore Sedgwick, 1 *Sedgwick on Damages* § 387, 546 (8th ed 1891) (hereinafter 1 *Sedgwick on Damages* (8th ed)) ("it is error to instruct the jury to give exemplary damages, for the plaintiff can never claim them as a matter of law"). *See also Smith v. Wade*, 461 US 30, 52, 103 S Ct 1625, 75 L Ed 2d 632 (1983) (because punitive damages are within jury's discretion, they "are never awarded as of right, no matter how egregious the defendant's conduct"). Second, courts refused to allow plaintiffs to assert a claim for punitive damages, alone, as the basis for an action. *See* 1 *Sedgwick on Damages* (8th ed) § 361 at 525 (citing cases). Finally, courts circumscribed plaintiffs' ability to recover punitive damages in various circumstances deemed inappropriate. *See, e.g.*, Francis Hilliard, *The Law of Remedies for Torts, or Private Wrongs* § 17, 446 (1867) (citing cases barring recovery when tortfeasor is deceased and, thus, cannot be punished); 1 *Sedgwick on Damages* (8th ed) § 370 at 531 (citing cases barring recovery of punitive damages in breach of contract cases).

The foregoing historical circumstances indicate that, around the time the Oregon Constitution was drafted in 1857, most courts and commentators viewed punitive damages as a means by which society could punish and deter egregious behavior and not as a "remedy" for an injured party. Furthermore, although plaintiffs were acknowledged as the traditional beneficiaries of those damages, plaintiffs

could not claim those damages as a matter of right or entitlement. Having examined the text of the remedy clause and historical evidence, our final step is to examine Oregon case law to determine whether this court's rulings are consistent with the notion that punitive damages are not a "remedy" within the meaning of Article I, section 10. *See Priest*, 314 Or at 415-16.

### 3. *Oregon Case Law*

Like the majority of courts in other states, the earliest Oregon Supreme Court cases endorsed the view that juries could award punitive damages in those cases in which the defendant had injured the plaintiff "wilfully" or with "express malice." *See Moore v. Floyd*, 4 Or 101, 104 (1871) (in cases of willful neglect, "exemplary damages might be recovered against [defendant]"). *See also Heneky v. Smith*, 10 Or 349, 353 (1882); *Smith v. Harris*, 7 Or 76, 77 (1879) (both holding same). However, the Oregon Supreme Court did not address the doctrine of punitive damages meaningfully until 1885, when it decided *Sullivan v. Oreg. Ry. & N. Co.*, 12 Or 392, 7 P 508 (1885). There, this court stated:

> "It has in many instances been seriously questioned whether exemplary or punitive damages could properly be allowed in any private action. It would be extremely difficult, if not impossible, to give any good reason for such allowance, since the rule giving actual damages has been so liberally construed; but, however that may be, it seems to have attached itself to our jurisprudence, and we are made recipients of its benefits and compelled to endure the hardships it imposes. * * * When the conduct of a person has been wilful, malicious, and wanton or reckless, and an injury has resulted to another in consequence of it, a jury might, with a semblance of reason, in an action to recover damages for such injury, assess something more than a mere compensatory sum therefor. That course, doubtless, would have a salutary effect in two respects: would visit the wrong-doer with wholesome punishment, and afford an example calculated to deter others from the commission of malevolent acts[.]"

*Id.* at 404.

Thus, in *Sullivan*, based upon the principle of *stare decisis*, this court accepted the doctrine of punitive damages

as a means of punishment and deterrence. This court never has articulated any other rationale for the doctrine. *See, e.g., Honeywell v. Sterling Furniture Co.*, 310 Or 206, 210, 797 P2d 1019 (1990) ("Punitive damages are not a substitute for compensatory awards nor an offset against litigation expense." (Internal quotation marks omitted.)); *Lane County v. Wood*, 298 Or 191, 203, 691 P2d 473 (1984) ("Punitive damages are not to compensate an injured party, but to give bad actors a legal spanking."); *Noe v. Kaiser Foundation Hosp.*, 248 Or 420, 425, 435 P2d 306 (1967) ("Punitive damages can only be justified on the theory of determent."). *See also* Hodel, 44 Or L Rev at 182 ("No Oregon case has been found which approves of the idea that exemplary damages are allowed to give the plaintiff revenge, and no cases assert the compensatory function of exemplary damages as a justification for their award."). Furthermore, Oregon courts viewed the punitive and deterrent effect of punitive damages as vindicating interests of society in general, and not of any plaintiff in particular. *See, e.g., Stroud v. Denny's Restaurant*, 271 Or 430, 437, 532 P2d 790 (1975); *Noe*, 248 Or at 425 (both so stating).

Consistent with those views, this court never has recognized punitive damages as an entitlement or right protected by the Oregon Constitution. For example, in *Osmun v. Winters*, 25 Or 260, 268, 35 P 250 (1894), this court held that " 'the question whether [exemplary damages] shall be given or not is one for the jury, and it is erroneous to instruct the jury to give exemplary damages, *for the plaintiff can never recover them as a matter of law*.' " (Quoting *Jacobs v. Sire*, 23 NYS 1063, 1064 (NY Super 1893)) (emphasis added). *See also Hall*, 292 Or at 146 ("Where such damages beyond any actual injury are allowable, the plaintiff collects them as a form of public punishment, not by virtue of a personal entitlement to compensation."); *State ex rel Young v. Crookham*, 290 Or 61, 71-72, 618 P2d 1268 (1980) ("The issue in determining punitive damages is not who will share what with whom, but the sufficiency of the deterrent effect of punitive damages on the defendant."); *Van Lom v. Schneiderman*, 187 Or 89, 108, 210 P2d 461 (1949) ("[T]he jury has entire discretion to refrain from giving any punitive damages at all even though all the elements of malicious and damaging misconduct may have

been established."); *Lane v. Schilling et al.*, 130 Or 119, 127, 279 P 267 (1929) (plaintiff receives "exemplary damages to which he is not entitled as a matter of right and compensation").

Courts and commentators nonetheless have advanced a number of reasons why plaintiffs *should* receive punitive damages awards. One of the more common arguments, articulated by Sedgwick among others, is that the prospect of receiving punitive damages provides an incentive for plaintiffs to "prosecute" claims that the state otherwise would not pursue, *i.e.*, to act as so-called "private attorneys general." *See Sedgwick on Damages* (4th ed) at 532 fn ‡, 535 (discussing punitive damages as inducement to pursue claims); Hodel, 44 Or L Rev at 182 (same). Indeed, for that reason this court has noted the "utility" of punitive damages. *See Crookham*, 290 Or at 68-69 (discussing rationales for multiple awards of punitive damages against single wrongdoer for a single wrongful act). That rationale for awarding punitive damages also is consistent with the underlying purpose of punitive damages as serving a societal interest.

As the cases previously discussed demonstrate, this court for more than a century has affirmed the usefulness of punitive damages as a means to punish and deter wrongful conduct. We also have recognized the "desirability" of awarding punitive damages to plaintiffs to provide an incentive to bring claims against wrongdoers. *Crookham*, 290 Or at 68. However, the extent of that incentive is a matter of common-law adjudication or policy, and this court never has viewed it as a constitutional entitlement under Article I, section 10. As such, like other nonconstitutional issues of law, the allocation of punitive damages may be changed by the legislature. "[O]rdinarily, the creation of law for reasons of public policy * * * is a task assigned to the legislature, not to the courts." *Bennett v. Farmers Ins. Co.*, 332 Or 138, 149, 26 P3d 785 (2001).

To summarize, although this court's first discussions of punitive damages awards are not precisely contemporaneous with the drafting of the Oregon Constitution in 1857, they contain some of the earliest expressions of the purpose and nature of punitive damages in the state. When taken

together with the historical circumstances surrounding the drafting of Article I, section 10, they lead us to conclude that punitive damages were understood as a means of vindicating society's interest in punishing and deterring especially egregious conduct, rather than as "a means for seeking redress for injury" to person, property or reputation. Accordingly, we hold that ORS 18.540 does not deprive plaintiffs of a remedy protected under Article I, section 10, by allocating part of punitive damages awards to the state.

B. *The Right to Jury Trial*

■ We next address the certified question whether ORS 18.540 violates plaintiffs' right to a jury trial as guaranteed by Article I, section 17, and Article VII (Amended), section 3, of the Oregon Constitution. We begin with Article I, section 17, which provides that "[i]n all civil cases the right of trial by jury shall remain inviolate."

In *Lakin v. Senco Products, Inc.*, 329 Or 62, 78, 987 P2d 463 (1999), this court concluded that a statutory cap on noneconomic compensatory damages was unconstitutional because, in a civil action to which the right to a jury trial attached in 1857, Article I, section 17, "prohibits the legislature from interfering with the full effect of a jury's assessment of noneconomic damages[.]" Plaintiffs rely on *Lakin* to argue that the distributive scheme of ORS 18.540 similarly is unconstitutional under Article I, section 17, because that scheme acts like a "cap" in preventing a plaintiff from receiving the full amount of a jury's punitive damages award.

We disagree with plaintiffs. As we explained in *Jensen*, 334 Or at 422:

> "*Article I, section 17, is not a source of law that creates or retains a substantive claim or a theory of recovery in favor of any party.* Instead, * * * Article I, section 17, simply 'guaranteés a jury trial in civil actions for which the common law provided a jury trial when the Oregon Constitution was adopted in 1857[.]' *Lakin*, 329 Or at 82 (citing *Molodyh v. Truck Insurance Exchange*, 304 Or 290, 744 P2d 992 (1987)). The right to pursue a 'civil action,' if it exists, must arise *from some source other than Article I, section 17*[.]"

(Citations omitted; emphasis added.) Likewise, if a "right" to receive an award that reflects the jury's determination of the amount of punitive damages exists, then it must arise from some source other than Article I, section 17. For example, in *Lakin*, the plaintiffs' rights under Article I, section 17, were violated, because the cap on noneconomic compensatory damages interfered with the plaintiffs' "right to receive an award that reflect[ed] the jury's factual determination of the amount of the damages" that would " '* * * fully compensate [plaintiffs] for all loss and injury to [them].' '" 329 Or at 81 (quoting *Oliver v. N.P.T. Co.*, 3 Or 84, 87-88 (1869)). Here, in contrast, plaintiffs have no underlying "right to receive an award" that reflects the jury's determination of the amount of punitive damages, nor are those damages necessary to "compensate" plaintiffs for a "loss or injury [to them]." 334 Or at 446 (no right to punitive damages as remedy under Article I, section 10). Because plaintiffs lack that right, the legislature's allocation of a portion of the punitive damages award to the state does not implicate Article I, section 17.

We next turn to address Article VII (Amended), section 3, which provides that "no fact tried by a jury shall be otherwise re-examined in any court of this state * * *." Although plaintiffs have no constitutionally protected right to punitive damages, those damages often are available, and the jury is allowed to determine the appropriate amount. This court has held that, under Article VII (Amended), section 3, the assessment of punitive damages is a determination of fact for the jury. *See, e.g., Van Lom v. Schneiderman*, 187 Or 89, 110-11, 210 P2d 461 (1949), *overruled in part on other grounds by Oberg v. Honda Motor, Ltd.*, 320 Or 544, 888 P2d 8 (1995). The effect of ORS 18.540, however, is not to modify a jury's assessment of punitive damages, but, instead, to modify the way in which those damages are *distributed*.

The distribution of punitive damages is *not* a factual determination that a jury makes. This court suggested that conclusion in *Honeywell v. Sterling Furniture Co.*, 310 Or 206, 797 P2d 1019 (1990). There, this court addressed the question whether it was error to inform a jury "that a portion of any punitive damages award would be used to pay the plaintiff's attorney or to contribute to a worthy cause, such as help for victims of crime," under ORS 18.540. *Id.* at 211. The

court concluded that "a jury should be told *nothing* concerning the distribution of an award of punitive damages," *id.* at 208 (emphasis added), and that, in fact, it is reversible error if a trial court provides any information to a jury "as to how the law require[s] any award of punitive damages to be distributed," *id.* at 211. As this court stated in *State ex rel Young v. Crookham*, 290 Or 61, 71-72, 618 P2d 1268 (1980), "[t]he issue in determining punitive damages is not who will share what with whom, but the sufficiency of the deterrent effort of punitive damages on the defendant." Thus, because ORS 18.540 concerns the *distribution* of a punitive damages award only, it does not require a court to reexamine any factual determination that a jury might have made. Accordingly, we conclude that ORS 18.540 does not violate Article VII (Amended), section 3.

## C. *Takings and Tax Claims*

We address together the certified questions whether ORS 18.540 constitutes a taking of property without compensation in violation of Article I, section 18, of the Oregon Constitution, or whether that statute constitutes a revenue bill or tax in violation of Article IV, section 18, and Article IX, sections 1 and 3, of the Oregon Constitution.[13] With respect to both issues, plaintiffs assert that they have a vested property right in the punitive damages awarded in this case. Therefore, they argue that ORS 18.540 either constitutes a taking of, or a tax on, their property. The state argues that plaintiffs' claims have no merit because plaintiffs never acquired a vested property interest in that portion of the punitive damages award that ORS 18.540 reserved for the Criminal Injuries Compensation Account. Again, we agree with the state and, as a consequence, also conclude, with respect to the certified questions, that ORS 18.540 does not violate Article I, section 18, Article IV, section 18, or Article IX, sections 1 or 3.

---

[13] We note that plaintiffs conceded at oral argument that, if this court determined that punitive damages awards were not a "remedy" protected under Article I, section 10, then those damages did not qualify as "property" subject to a takings claim. Nonetheless, we address the arguments presented in plaintiffs' brief to answer fully the questions that the district court certified.

Article I, section 18, provides that "[p]rivate property shall not be taken for public use * * * without just compensation[.]" Although this court has held that "a judgment is personal property, giving rise to vested rights which the legislature cannot, by retroactive law, either destroy or diminish in value," *State ex rel v. Kiessenbeck*, 167 Or 25, 30, 114 P2d 147 (1941), this case does not involve the retroactive diminishment in value of a vested judgment. The statute at issue, ORS 18.540, took effect before plaintiffs filed their complaint and, from the outset, subjected any potential judgment for punitive damages to partial defeasance "upon the entry of a verdict." The question is whether a vested property right in a punitive damages award can accrue *before* entry of a final judgment for the purposes of Article I, section 18. The answer is that it cannot.

As we explained previously in this opinion, a plaintiff has no right or entitlement to punitive damages as a remedy under Article I, section 10, and, as a result, the jury has complete discretion not to award punitive damages, even if a plaintiff successfully proves all elements of a claim. 334 Or at 444-45. Consequently, before entry of a final judgment, a plaintiff in Oregon always has had, at most, an expectation of such an award. Moreover, in this case, in which the tort that gave rise to plaintiffs' claim occurred after ORS 18.540 was enacted, plaintiffs cannot credibly argue that they had any expectation interest in the portion of the punitive damages award that the statute directs to the Criminal Injuries Compensation Account. " 'A vested right must be something more than a mere expectation based upon the anticipated continuance of existing laws; it must have become a title legal or equitable to the present or future enjoyment of property.' " *Coshun v. Hurlburt et al.*, 102 Or 240, 243, 201 P 870 (1921) (quoting Black, *Constitutional Law* 430). We therefore hold that plaintiffs do not have a vested prejudgment property right in punitive damages.[14]

---

[14] We note that cases in other jurisdictions agree that a party has no vested property right in a claim for punitive damages until judgment is entered. *See, e.g., Fust v. Missouri*, 947 SW2d 424, 431 (Mo 1997) (rejecting takings challenge to split-recovery statute on ground that plaintiff has no vested property interest in punitive damages claim); *Mack Trucks, Inc. v. Conkle et al.*, 263 Ga 539, 544, 436 SE2d 635, 639 (1993) ("A plaintiff has no vested property right in the amount of punitive

Plaintiffs' arguments to the contrary are not persuasive. They cite no Oregon case law in support of their claim that punitive damages are the property of plaintiffs before judgment. Instead, they first rely upon two United States Supreme Court decisions that, in their view, provide some authority for the proposition that a property right protected by the "takings" clause of the Fifth Amendment to the United States Constitution may vest in a party to an action at a time *before* the property comes into existence or is subject to state control. In *Phillips v. Washington Legal Foundation*, 524 US 156, 118 S Ct 1925, 141 L Ed 2d 174 (1998), and *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 US 155, 101 S Ct 446, 66 L Ed 2d 358 (1980), the Supreme Court concluded that the owners of funds deposited with state entities had a property right in the future interest earned on those funds, if and when it accrued. *See Phillips*, 524 US at 172 (with respect to funds deposited with state-adopted lawyer trust account program); *Webb's*, 449 US at 161-62 (with respect to interpleader funds deposited with courts). Plaintiffs urge this court to apply similar reasoning to find a property right in a future punitive damages award under Article I, section 18, if and when a jury decides to include such an award in a verdict.

 We do not consider *Webb's* and *Phillips* to be relevant here. As those cases emphasize, "the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" *Phillips*, 524 US at 164 (quoting *Board of Regents of State Colleges v. Roth*, 408 US 564, 577, 92 S Ct 2701, 2709, 33 L Ed 2d 548 (1972)). *See also Webb's*, 449 US at 161 (stating same). In both *Webb's* and *Phillips*, the

damages which can be awarded in any case[.]"); *Gordon v. State*, 608 So 2d 800, 801-02 (Fl 1992) (" 'The right to have punitive damages assessed is not property; and it is the general rule that, until a judgment is rendered, there is no vested right in a claim for punitive damages. * * *' "); *Shepherd Components, Inc. v. Brice Petrides-Donohue & Assoc.*, 473 NW2d 612, 619 (Iowa 1991) ("[P]laintiff did not have a vested right to punitive damages prior to the entry of a judgment."); *Smith v. Hill*, 12 Ill 2d 588, 595, 147 NE2d 321, 325 (1958) (no right to punitive damages "until a vested property right attaches to them through a judgment"); *Louisville & Nashville R.R. v. Street*, 164 Ala 155, 51 So 306, 307 (1909) (no property right in punitive damages award); *Osborn v. Leach*, 135 NC 628, 47 SE 811, 813 (NC 1904) (punitive damages awarded "on grounds of public policy" and are "therefore not property").

Supreme Court grounded its recognition of a property right in the "interest follows principal" rule, which "ha[d] been established under English common law since at least the mid-1700's," and was "firmly embedded in the common law of the various States." *Phillips,* 524 US at 165. Put another way, the Supreme Court held that interest earned on principal was "private property" subject to a takings claim only because it was a "traditional property interest[ ] long recognized under state law." *Id.* at 167. In contrast, as we have explained, there is no "long-recognized" private property interest in an Oregon punitive damages award before judgment; it always has been, at most, an expectation.[15]

Plaintiffs next rely upon *Kirk v. Denver Publishing Co.,* 818 P2d 262, 270-72 (Colo 1991), in which the Supreme Court of Colorado concluded that a plaintiff possessed a vested property right to a punitive damages award in its entirety and that Colorado's split-recovery statute, which would have allocated one-third of that award to a state general fund, amounted to an unconstitutional taking under the state and federal constitutions.[16] The *Kirk* decision, however, is distinguishable from this case. There, the court emphasized that Colorado's split-recovery statute "affirmatively disavowed" any state interest in the judgment before payment becoming due. *Kirk,* 818 P2d at 272. The court then

---

[15] Plaintiffs' suggested interpretation of the holdings in *Webb's* and *Phillips* in a manner that restricts the ability of states to regulate punitive damages also is inconsistent with the Supreme Court's traditional deference to state legislatures in that regard. *See, e.g., Cooper Indus. v. Leatherman Tool Group, Inc.,* 532 US 424, 433, 121 S Ct 1678, 149 L Ed 2d 674 (2001) ("legislatures enjoy broad discretion in authorizing and limiting permissible punitive damages awards"); *BMW of North America, Inc. v. Gore,* 517 US 559, 568, 116 S Ct 1589, 134 L Ed 2d 809 (1996) ("States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case."); *Pacific Mutual Life Insurance Co. v. Haslip,* 499 US 1, 39, 111 S Ct 1032, 113 L Ed 2d 1 (1990) (Scalia, J., concurring) ("State legislatures and courts have the power to restrict or abolish the common-law practice of punitive damages[.]").

[16] At issue in *Kirk* was *former* Colo Rev Stat § 13-21-102(4) (1987) (repealed 1995), which stated:

"One-third of all reasonable damages collected pursuant to this section shall be paid into the state general fund. The remaining two-thirds of such damages collected shall be paid to the injured party. Nothing in this subsection (4) shall be construed to give the general fund any interest in the claim for exemplary damages or in the litigation itself at any time prior to payment becoming due."

concluded that such a repudiation "affirmatively belie[d] any notion that the judgment creditor's property interest in the judgment [was] less than total." *Id.* at 272. In other words, "[Colorado's] asserted interest [was] not in the judgment itself but in the monies collected on the judgment, *and that interest [arose] only at a point in time after the judgment creditor's property interest in the judgment ha[d] vested by operation of law." Id.* (emphasis added).

Regardless of our view of the soundness of the conclusions in *Kirk*,[17] unlike the split-recovery statute at issue in that case, ORS 18.540 does not disavow an interest in a judgment for punitive damages until monies are collected. Rather, it asserts that the state has an interest immediately "upon entry of a verdict." Contrary to plaintiffs' contentions, that is a significant distinction that the *Kirk* majority itself acknowledged. *See Kirk*, 818 P2d at 272 (without statutory repudiation of state interest in judgment, split-recovery statute "might be read to defeat any reasonable economic expectation on the part of the judgment creditor to the total judgment"). Oregon's split-recovery statute never allows a plaintiff to obtain a "reasonable economic expectation" of a punitive damages award in its entirety. Thus, there is no ground similar to that in *Kirk* upon which to conclude that a plaintiff obtains a vested property right in a punitive damages award.[18]

Plaintiffs' other arguments in support of their position are not well taken. We conclude that a party never obtains a prejudgment property interest in a punitive damages award and, therefore, that ORS 18.540, by allocating 60

---

[17] Like the Supreme Court of Missouri, we do not agree with "the implicit conclusion in *Kirk* that a plaintiff has a greater property interest in a judgment upon a tort claim than the interest recognized by law when the claim accrued." *Fust v. Missouri*, 947 SW2d 424, 431 (Mo 1997). *See also Gordon v. State*, 585 So 2d 1033, 1036 (Fla App 1991) ("where an existing statute provides that funds recovered under it are subject to a prior claim, a party cannot thereafter obtain a vested right to that claim").

[18] We also note that, given the unique provisions of the split-recovery statute at issue, *Kirk* stands alone among state supreme court decisions in striking down a split-recovery statute as an unconstitutional taking. *See Fust v. Missouri*, 947 SW2d 424, 431 (Mo 1997); *Mack Trucks, Inc. v. Conkle et al.*, 263 Ga 539, 544, 436 SE2d 635, 639 (1993); *Gordon v. State*, 608 So 2d 800, 801-02 (Fl 1992); *Shepherd Components, Inc. v. Brice Petrides-Donohue & Assoc.*, 473 NW2d 612, 619 (Iowa 1991) (all upholding split-recovery statutes against takings challenges).

percent of such an award to the state, is not "taking" private property without compensation in violation of Article I, section 18, of the Oregon Constitution. It also follows from that conclusion that ORS 18.540 is neither a tax in violation of Article IX, sections 1 and 3, *see Perry v. State Tax Commission*, 245 Or 483, 486, 422 P2d 578 (1967) (property not subject to taxes if not "held" by person with possession or right to possession of property), nor a revenue bill enacted in violation of Article IV, section 18, *see Northern Counties Trust v. Sears*, 30 Or 388, 401-02, 41 P 931 (1895) (characterizing revenue bill as one that imposes tax on property).[19]

## D. *Separation of Powers*

The final certified question asks whether ORS 18.540 interferes with the judiciary in violation of the separation of powers provisions of Article III, section 1, and Article VII (Amended), section 1, of the Oregon Constitution.

Article III, section 1, provides, in part:

"The powers of the Government shall be divided into three seperate (sic) departments, the Legislative, the Executive, including the administrative, and Judicial; and no person charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided."

Article VII (Amended), section 1, provides, in part:

"The judicial power of the state shall be vested in one supreme court and in such other courts as may from time to time be created by law."

---

[19] Article IX, section 1, of the Oregon Constitution, provides:

"The Legislative Assembly shall, and the people through the initiative may, provide by law uniform rules of assessment and taxation. All taxes shall be levied and collected under general laws operating uniformly throughout the State."

Article IX, section 3, of the Oregon Constitution, further provides that "[n]o tax shall be levied except in accordance with law."

Article IV, section 18, of the Oregon Constitution, provides:

"Bills may originate in either house, but may be amended, or rejected in the other; except that bills for raising revenue shall originate in the House of Representatives."

Article III (Amended), section 1, is violated if "a 'person' or member of one department is exercising a function of another department of government." *Circuit Court v. AFSCME*, 295 Or 542, 547, 669 P2d 314 (1983). Article VII, section 1, is implicated when "some other department of government, by legislation or otherwise, prevents or obstructs the courts' exercise of its judicial power." *Id.*

■ Plaintiffs assert that, by requiring courts to list the state as a judgment creditor under ORS 18.540, the legislature has violated both the foregoing provisions by interfering with a judicial function, specifically, the obligation to enter a judgment "consistent with a jury's verdict." We disagree. As this court explained in *AFSCME,*

> "[t]here can be no question that the legislature may enact laws prescribing the exercise of judicial powers. 'The rule has evolved that legislation can affect [the courts] so long as it does not unduly burden or substantially interfere with the judiciary.'"

295 Or at 549 (quoting *Sadler v. Oregon State Bar*, 275 Or 279, 285, 550 P2d 1218 (1976)). "Only an outright hindrance of a court's ability to adjudicate a case * * * or the substantial destruction of the exercise of a power essential to the adjudicatory function" will render legislation constitutionally defective under Article VII (Amended), section 1. *Id.* at 551.

By setting out a distributive scheme for punitive damages awards in ORS 18.540, the legislature has not interfered impermissibly with the adjudication of plaintiffs' claims. As we explained in the previous section, the distribution of punitive damages is not a matter within a jury's discretion or, even, a matter that it considers. 334 Or at 448. As it has done in other areas of the law, by enacting ORS 18.540 the legislature has established reasonable guidelines for courts to follow in the exercise of their duties. *See, e.g., State ex rel Huddleston v. Sawyer*, 324 Or 597, 614, 932 P2d 1145, *cert den* 522 US 994 (1997) (mandatory minimum sentences do not violate separation of powers); *State ex rel Ray Wells, Inc. v. Hargreaves*, 306 Or 610, 615 n 2, 761 P2d 1306 (1988) (legislature did not perform judicial function when it enacted judge disqualification statutes); *Nendel v. Meyers*, 162 Or 661, 664, 94 P2d 680 (1939) (statute requiring court to decide

motion for new trial within 55 days does not violate separation of powers).

### III.

For the foregoing reasons, we conclude that the legislature contemplated that ORS 18.540 would apply in federal cases arising under state law and that the statute does not violate Article I, sections 10, 17, or 18; Article III, section 1; Article IV, section 18; Article VII (Amended), sections 1 or 3; or Article IX, sections 1 or 3, of the Oregon Constitution.

Certified questions and additional question answered.